1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF TENNESSEE

3       AT GREENEVILLE

4

5  UNITED STATES OF AMERICA,

6

7     PLAINTIFF,

8

9  VS       CA:  2:11-CR-81

10

11  BUFORD W. ROGERS AND RODNEY E. TULLOCK,

12

13     DEFENDANTS.

14

15    PRETRIAL CONFERENCE AND MOTION HEARING

16    HONORABLE DENNIS H. INMAN, PRESIDING

17     HEARD ON DECEMBER 7, 2011

18

19

20  APPEARANCES:

21  FOR PLAINTIFF:  CARYN L. HEBETS, ESQ.

22  FOR DEFENDANT ROGERS:

23       DAVID L. LEONARD, ESQ.

24  FOR DEFENDANT TULLOCK:

25       ERIC D. REACH, ESQ.

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

TABLE OF CONTENTS

TITLE SHEET                                    1

TABLE OF CONTENTS                              2

PRELIMINARY                                    3

COURT AND COUNSEL                              3-8

WITNESS: JACOB STIELOW

    Direct Examination, Ms. Hebets            9-17

    Cross Examination, Mr. Reach              18-27

    Examination by the Court                  28-29

COURT AND COUNSEL                              30-32

WITNESS: GREGORY SMITH

    Direct Examination, Ms. Hebets            33-40

    Cross Examination, Mr. Reach              41-46

    Redirect Examination, Ms. Hebets          47

WITNESS: JIM WILLIAMS

    Direct Examination, Ms. Hebets            48-55

    Cross Examination, Mr. Reach              56-59

COURT AND COUNSEL                              59-60

WITNESS: KEVIN POE

    Direct Examination, Ms. Hebets            61-71

COURT AND COUNSEL                              72

CERTIFICATE                                    73

EXHIBITS                                       Ref. Page

Exhibit 1, Copy of Warning Ticket Issued

to Mr. Tullock (Retained in Court File)        16

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

This cause came on to be heard on this the 7th of December, 2011 in the United States District Court, Eastern District of Tennessee at Greeneville, before the Honorable Dennis H. Inman.  Present and representing the Plaintiff was Caryn L. Hebets.  Present and representing Defendant Rogers was David L. Leonard.  Present and representing Defendant Tullock was Eric Reach.

The following matters were presented, to-wit:

CLERK:  All rise.  United States District Court for the Eastern District of Tennessee, the Honorable Dennis H. Inman presiding, is now in session.  Please be seated.

THE COURT:  All right.

CLERK:  Case Number 2:11-CR-81, <u>United States of America Versus Buford W. Rogers and Rodney E. Tullock</u>.

THE COURT:  Ms. Headon is desirous of filing the Final Pretrial Order and in that regard, wants to know if everyone's best estimate is still three weeks on the current conditions.

MS. HEBETS:  Your Honor, I think that's,

1    under current conditions, still an appropriate
2    estimate.
3              THE COURT:  All right.
4              MR. LEONARD:  Your Honor, there is a - I
5    believe on behalf of Charles Parker there is a Motion
6    to Continue filed.  When is the Court going to take
7    that up?
8              THE COURT:  I'm sorry.  Mr. Leonard, say
9    again.
10             MR. LEONARD:  There is a - on behalf of Mr.
11   Parker there was a Motion to Continue the trial date
12   filed, and I, the name of his attorney escapes me,
13   but when is the Court going to take that matter up?
14             UNIDENTIFIED:  That's Francis (INAUDIBLE).
15             THE COURT:  I don't know.
16             MR. LEONARD:  Okay.
17             THE COURT:  I mean, I'm not - that's,
18   that's a, that's truthful; I don't know.
19             CLERK:  Do you want me to find that for
20   you?  Do you want me to find that for you?
21             THE COURT:  That motion?  No.  I've got it
22   in there.  That's okay.  Okay.  I, let's see.  First
23   of all, with respect to Mr. Leonard's motions, apart
24   from his Motion to Suppress, do either of you, Ms.
25   Hebets, Mr. Leonard, want to say anything?

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1          MS. HEBETS: Nothing from the United States,

2     Your Honor.

3          MR. LEONARD:  Nothing further, Your Honor.

4          THE COURT:  Which leaves us with three

5     Motions to Suppress, right?

6          MS. HEBETS:  Four.

7          THE COURT:  Four?

8          MS. HEBETS:  Well - yes.  You haven't

9     withdrawn your motion, have you?

10          MR. LEONARD:  No.  Your Honor, on the

11     motion concerning the search of the storage facility

12     in Knox County, there is a little footnote on the

13     first page of my memorandum talking about the

14     standing issue.  The discovery in this case is

15     voluminous, and I did see in the discovery where it

16     was alleged that Mr. Rogers was only an emergency

17     contact on, on the lease agreement for the facility.

18     I could not find any indication that he was an owner

19     of the storage unit or the actual person leasing the

20     storage unit, so I did file this in an abundance of

21     caution to give Mr. Rogers a fair shake at this, and

22     certainly we can rely upon the motion and memorandum

23     that I filed and the response by Ms. Hebets.  I don't

24     think there's any need for further argument on that.

25     It is a standing issue, and I'm not going to withdraw

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1   the motion, but I think there's enough information

2   for you to rule on that issue.

3           THE COURT:  Okay.  But can I, can I say,

4   state in my R&R that you agree that he was, in fact,

5   only an emergency contact...?

6           MR. LEONARD:  Yes.

7           THE COURT:  ...and not...?

8           MR. LEONARD:  That's correct.

9           THE COURT:  Okay.  He was not the lessee.

10  Who was the lessee, if that matters?  Is the lease

11  agreement an exhibit to anything?

12          MS. HEBETS:  It is not an exhibit to any of

13  the documents filed.  I do have a copy of it in the

14  Courtroom, and it provides that the occupant is a

15  Susan Derfone and I can, if the Court would indulge

16  me to use the copier, can make a copy and submit it.

17          THE COURT:  Well, I don't - okay.  It's not

18  important who it is.  Suffice it to say that the

19  actual lease agreement lists somebody other Mr.

20  Rogers as the tenant?

21          MS. HEBETS:  Yes, Your Honor.

22          THE COURT:  Okay.  Well, does anyone have

23  any particular preference what order we take these

24  Motions to Suppress?

25          MS. HEBETS:  Your Honor, I would ask the

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1    Court to allow me to address the, Mr. Tullock's

2    Motion to Suppress the traffic stop, only because the

3    trooper is from Nashville, and he's concerned about

4    waiting too long, delaying too long in order to

5    travel back, given the weather conditions that's, I

6    guess, are moving this way from the western...

7            THE COURT:  They move...

8            MS. HEBETS:  ...part of the state.

9            THE COURT:  They move west to east around

10   here.

11           MS. HEBETS:  Yes.

12           THE COURT:  That's right.  Fair enough.  So

13   let's call this one then.  This will be Mr. Tullock's

14   Motion to Suppress.  That is the one, isn't it?

15           MS. HEBETS:  Mr. Tullock's Motion to

16   Suppress, yes.  It's, I believe it was Document 266?

17           MR. REACH:  Yes, Your Honor, 266.

18           THE COURT:  Okay.

19           MS. HEBETS:  And the United States calls

20   Trooper Jacob Stielow.

21           THE COURT:  Let's see.  Is the - will he,

22   will the Trooper be the only witness for the

23   Government?

24           MS. HEBETS:  Yes.  There are additional

25   facts in the response, but they're not pertinent to

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

the traffic stop.

THE COURT:  Okay.  Mr. Reach, do you have any witnesses you're going to call in that regard?

MR. REACH:  No, Your Honor.

THE COURT:  Okay.  So the Rule is irrelevant?

MS. HEBETS:  Correct.


(WITNESS IS SWORN)


CLERK:  Have a seat.  What is your last name?

TROOPER STIELOW:  Last name is Stielow.

CLERK:  Stielow, S-T-I-E-L-O-W?

TROOPER STIELOW:  Yes, Ma'am, I-E-O-W.

1          TROOPER JACOB STIELOW, after first being
2     duly sworn, testified as follows:
3
4          DIRECT EXAMINATION BY MS. HEBETS:
5
6          Q.   Could you state your name for the
7     record?
8          A.   Trooper Jacob S. Stielow.
9          Q.   And how do you spell your last name?
10         A.   S-T-I-E-L-O-W.
11         Q.   How are you employed?
12         A.   I'm a Trooper with the Tennessee
13    Highway Patrol.
14         Q.   How long have you been with the
15    Tennessee Highway Patrol?
16         A.   Since January of 2005.
17         Q.   Were you a police officer before that?
18         A.   I was a deputy with the Knox County
19    Sheriff's Department.
20         Q.   So how long in total have you been a
21    law enforcement officer?
22         A.   Seven years.
23         Q.   Okay.  And with the Highway Patrol,
24    Tennessee Highway Patrol, what are your primary
25    responsibilities?

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1        A.   Traffic enforcement, working crashes,

2   writing tickets, trying to make the highway a safer

3   place.

4        Q.   Okay.  Now one of the offenses, are

5   you familiar with following too closely?

6        A.   Yes, Ma'am.

7        Q.   And could you - is that, in fact, a

8   violation of the Tennessee Code?

9        A.   Yes, Ma'am.  I believe it's 55.8.124,

10  if I'm not mistaken.

11       Q.   And what exactly does that entail?

12       A.   It basically states that a driver of a

13  vehicle shall not follow another vehicle more closely

14  than is reasonable, based on speed, weather

15  conditions, road conditions, that, you know, if

16  you're hauling a trailer, you know, size of your

17  vehicle, size of the load you're hauling, you know,

18  if you've got a load in the back of pickup.

19  Basically it's a lot of different conditions based on

20  that TCA.

21       Q.   And as your, in your seven years of

22  experience have you written tickets for following too

23  closely?

24       A.   Absolutely.  I've written, we call

25  them hard copies, which is the copies that will go

to, you know, the Court, warning tickets, both.

Q.   Okay.

A.   It's a common occurrence for crashes.
It's one of the leading reasons for, you know, rear
end collisions, is following too closely.

Q.   Okay.  And just before we get into the
facts of this case, could you give the Court an
estimate of how many traffic stops you're involved
in, you were involved in on a daily basis back in
2010?

A.   Anywhere from, on a slow day, maybe
eight, on a busy day, twenty plus.

THE COURT: How many?  I mean, what?  What?

A.   Seven, you know, on a slow day.  If
I'm really out there humping it, twenty plus.

THE COURT: Okay.  Tickets or crashes?

A.   No, no.  Stops.

Q.   Traffic stops.

THE COURT: Stops?  Excuse me.

A.   Yes, Sir.  Stops.

Q.   Now do you recall the date of April
21st of 2010?

A.   Yes, Ma'am.

Q.   And were you working as a Highway
Patrol Officer on that date, a trooper?

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

A.    Yes, Ma'am.

Q.    Where were you stationed at that
point?

A.    In the Fall Branch District.  You
know, we work a lot of different counties, you know.
My actual assignment was Washington County, but, you
know, we worked multiple, as Washington County based
on troop levels, you know.  If there was work over in
Greene County we'd come over in Greene County.  We'd
work Carter County or, so, my actual assignment was a
Washington County Trooper.  On this date, I think, I
was in Greene County.

Q.    Okay.  So you were in Greene County?
And do you have a specific recollection of a
conversation with the TBI Special Agent Chucky
Wilhoit regarding a particular vehicle?

A.    I remember talking to Agent Wilhoit.
The specifics of the conversation I don't recall.

Q.    Okay.

A.    I, you know, basically just
generalities.  You know, if you're working over here,
if you see this vehicle, you know, we'd be interested
in if it was stopped, you know, what you found.  But,
you know, we don't have any specific information, and
if you are going to - if you do see it, you know, get

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1    your own probable cause and...

2            Q.   Okay.

3            A.   ...that type of thing, but nothing

4    specifics.  It's hard to remember that far back.

5            Q.   Okay.  Now did you, in fact, come

6    across this vehicle mentioned to you by Agent

7    Wilhoit?

8            A.   Yes, Ma'am.

9            Q.   And what type of vehicle was it?

10           A.   I believe it was a maroon, a maroon

11   van.  I don't remember the exact make, Chevy van.

12           Q.   Can you tell the Court where you first

13   were when you saw that van?

14           A.   I was out on Highway 321.  It's an

15   area I used to work quite a bit when I was over here.

16   We worked state routes a lot.

17           Q.   Okay.  And specifically on 321, do you

18   know where you were?

19           A.   I don't know exactly where I was.  No,

20   Ma'am.

21           Q.   Okay.

22           A.   I don't remember where.

23           THE COURT:  The highway between Greeneville

24   and Newport?

25           A.   Yes, Sir.

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

Q.   And what was your first observation of
this van?

A.   I, I don't remember my first
observation, you know, initially when I saw it.  I do
remember after seeing it thinking, wow, that van is
really close to the vehicle in front of it.  Pulled
it over shortly after that, and it seems like, and I
don't know exactly how the stop went, but I remember
thinking that we were not in a good place where the
actual, where the stop, the initial stop took place,
and we moved from there to a safer location.  That,
you know, sometimes those old highways out here,
there's no shoulder and curvy roads, and it's just,
it's not a good...

Q.   For safety...

A.   It's a good way to get somebody hurt.

Q.   For safety issues you moved?

A.   Absolutely.  So the stop
was moved from where the initial stop took place.

Q.   Okay.  Now you said you observed the
van following closely the vehicle in front of it,
correct?

A.   Yes, Ma'am.

Q.   And did you make a determination that
it was too close to the vehicle in front of it?

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

A.   Yes, Ma'am.  I based that
determination on, you know, a number of factors.
Everything's going to be taken into consideration,
the speed of the vehicles, the condition of the
roadway.  But my main thing I look at is, if the
vehicle that's following the vehicle in front of it,
if that front vehicle has to make a dynamic stop, say
a kid running out chasing a ball in front of it, a
deer running out, you know, somebody pulling out
really quickly from a side road, if something happens
and that front vehicle has to make a dynamic stop, is
there enough room for that vehicle following it to
get stopped without striking that vehicle that had to
stop instantly.  So that's really, and you know, that
can be, you know, even if you're traveling twenty-
five miles per hour, if you're right on somebody's
bumper and they have to stop you're not going to get
stopped in time.  Or if you're traveling seventy
miles per hour, it's the same thing.  The distances
are going to change, but that's really what I look
for, is based on the distance at that time, could the
vehicle in front get stopped to a complete stop
without being struck by the vehicle that's following
it, and based on that I determined that that was,
that was not the case in the particular instance.

Q.   And that's why you engaged in a, or conducted a traffic stop on the van?

A.   Yes, Ma'am.

Q.   And you, in fact, wrote a warning ticket to the driver, Mr. Tullock, correct?

A.   Yes, Ma'am.

Q.   And I have a copy of that warning ticket.  I know you have the original,...

A.   Yes, Ma'am.

Q.   ...but we'll just use the copy for the Court purposes, that I'd like to submit as Exhibit 1.

(WHEREUPON, EXHIBIT NUMBER 1, Copy of Warning Ticket Issued to Mr. Tullock, IS ADMITTED)

Q.   And during the traffic stop, did you notice anything particular about the driver, Mr. Tullock?

A.   Just, nothing, you know, really overtly.  He was a little nervous, and we had a conversation about his nervousness.  Well, I mean, anybody that gets stopped, I get stopped I'm going to get nervous instantly.  A lot of times as the traffic stop progresses that nerves, it'll slowly decrease, and especially if you're, you know, I mean, as far as

troopers go people think, well, you get pulled over

by a trooper you're going to get a ticket.  I mean,

that's just, that's the bottom line.  And so if you

get issued a warning ticket, usually people are very,

you know, everything drops, like oh, thank you, we

appreciate it.  So you know, the nerves never stopped

with Mr. Tullock, and I asked him about this, and at

the time I said, "Hey, you know, what's going on?"

He said, "Well, you know, it's just, I don't really

like being stopped."  And I said, "Are you on any

prescription medications?", 'cause that can be a

factor in somebody's hand shaking or the signs of

nervousness if you're some sort of medication.  He

said, "Yeah, I am."  And I said, "Well, do you have

any on you?"  "Yes, there's some in the vehicle."

"Okay, is there anything else in the vehicle?"  "No,

no, no.  I don't mess with anything else.  No, I

don't, I don't do anything like that."  "Okay.  Well,

would you mind if I searched your vehicle?"  "No, no.

Go ahead, go right ahead."  So other than the

nervousness and him stating that, you know, the

nervousness was based on the fact that he was taking

prescription medication, that's about the only thing.

     Q.   I have no further questions at this

time, Your Honor.

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

CROSS EXAMINATION BY MR. REACH:

Q.   Trooper Stielow, what were the weather conditions back on this date?

A.   I don't remember any adverse weather conditions at all.  Do you mean had it been raining or something like that?

Q.   Was it raining...?

A.   No.  No.

Q.   ...or anything like that?

A.   No, Sir.

Q.   And is Highway 321, was it - I know you said this was a curvy road at this, coming from Newport to Greeneville.  At this particular section when you saw him following too closely, was this a curvy section or...?

A.   Honestly, I guess, that specific section I can't, I don't recall if there's a turn, a curvy part right there.  I can't, I don't know.

Q.   How many tickets do you give for following too closely on average a month?

A.   Tickets or warning tickets?

Q.   Tickets or warning tickets.

A.   Combined?

Q.   Combined.

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

A.   Oh, warning tickets, probably two or
three.  Usually in order for me to give a ticket
that's going to cause somebody to go to Court over
it, it'll usually be the result of a crash.  If the
following too closely results in a crash occurring, I
will issue a ticket for the following too closely
violation.  If I stop somebody just to say hey, back
up a little bit.  You know, you're going to, you're
too close to them.  You're going to cause a crash.
You know, just watch, watch what you're doing, that's
when I'll issue a warning ticket.  You know, it has
to really be an egregious violation for me to issue a
warning, or a ticket without a crash occurring.  Now,
the number will depend on how many crashes I work
that month.  I would say a fair estimate would be
four to five a month, give or take a few.  So...

Q.   How often do you pull somebody over
simply for following too closely?  No other traffic
violation?

A.   I would say that once or twice a week.

Q.   And this particular day you had - when
did you receive a - was it a phone call or a radio
call from TBI?

A.   Phone call.

Q.   Phone call?

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1      A.   Uh-huh (affirmative).

2      Q.   When did you receive that phone call?

3      A.   The exact time I don't know.  Earlier

4   in the day.  I don't...

5      Q.   How close in relation to the stop?  Do

6   you recall?

7      A.   Honestly, I have no idea.

8      Q.   And were you given a description of

9   the vehicle to look at?

10     A.   Yes, Sir.

11     Q.   To look for?

12     A.   Yes, Sir.

13     Q.   Were you told a particular reason why?

14     A.   No, Sir.

15     Q.   Okay.  So...

16     A.   A lot of times, they, I mean, we do a

17   lot of these, get a lot of these phone calls, and we

18   usually don't get a lot of specifics.

19     Q.   Okay.  And, I mean, so you didn't

20   recall the exact conversation you had with them, but

21   was the basis that we're interested in this vehicle.

22   If you see a reason pull it over.  Is that...?

23     A.   That's a fair...

24     Q.   ...fair assumption?

25     A.   ...assumption.  Yes, Sir.

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

Q.   And were you running, were you on the
road?  Were you on the side of the road when you saw
Mr. Tullock's vehicle?

A.   It seems like, and I - it seems like I
was stopped along 321 running radar.

Q.   Okay.  Did you run radar on Mr.
Tullock's vehicle?

A.   More than likely I did.  Do I remember
a speed?  No, Sir.

Q.   Was he - and to your recollection was
he going too fast?

A.   Not to my - no.  I don't remember
thinking he was speeding, because, you know, if he
was speeding I would have wrote him a speeding
ticket.

Q.   Okay.  And did you follow him for any
length of time?

A.   I don't recall.

Q.   Okay.

A.   Usually I'll try to make a traffic
stop in a safe place, you know, but if somebody, you
know, needs pulled over right away, then I don't have
it, you know, anything to do with that.

Q.   Do you recall approximately how far
behind the vehicle in front of him he was?

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1          A.   An exact distance, no, Sir.  Like I

2     said, I just based it on at that time.  When I see

3     the vehicles, do I believe that if something happened

4     right then the vehicle that's following, could they

5     come to a stop in order to avoid hitting the vehicle

6     in front, so obviously that distance is going to

7     change.  Like I said, if the roads are wet then

8     you're going to need to increase that distance.  If

9     the roads are dry and it's - then you can maybe, you

10    know, get a little closer.

11          Q.   Okay.

12          A.   It's a lot of officer discretion

13    involved in that.

14          Q.   That was my next question, was the

15    reasonable and prudent standard of this particular

16    statute, would you agree that it provides for a wide

17    range of opinions on what is reasonable and prudent?

18          A.   Absolutely.

19          Q.   You may look at it as a trooper and

20    see that, yes, it is, and another trooper may say no,

21    that's not.

22          A.   I think that it's - that's absolutely

23    fair.

24          Q.   Okay.  The statute, it's very broad

25    discretion?

**Barringer Court Reporting**
**P.O. Box 8035, Gray, TN - 423-477-7844**

1      A.   I think it's - yes, and I think it's
2 meant to be, was written to be, to allow for a lot of
3 officer discretion because of all the variables that
4 go into, you know,...
5      Q.   Okay.
6      A.   ...how that's affected.
7      Q.   Was the vehicle in front of Mr.
8 Tullock that he was following too closely, was it -
9 do you recall anything about it braking, or was it
10 slowing down or...?
11      A.   I don't recall anything.
12      Q.   Okay.  Did you observe the vehicle in
13 front of him at all?
14      A.   Oh, absolutely.
15      Q.   Okay.
16      A.   But I don't remember, I mean, was it,
17 was it stopping?  I, no, I don't remember it stopping
18 to make a turn or anything.
19      Q.   Do you know if this particular section
20 of road, the speed limit slows down?
21      A.   I think there's a few different speed
22 limits on 321.  I think it changes once you get into
23 the city limits, and then as you get out further
24 towards Cocke County it speeds up a little bit 'cause
25 I think the road, if I - it's been a while since I've

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

been out here, but I think the road widens up to a

four lane at some point, if I'm not mistaken, and

then that speed limit goes up.

Q.   Okay.  If the car in front of him had

been slowing down and Mr. Tullock didn't have time to

react, would he have been too close?  Could he have

been too close specifically because of that?

A.   Well, I think the nature of driving is

you need to give yourself time to react.  If the car

in front of you is slowing down, then you need to

have enough space between you and that vehicle to

have time to react.

Q.   But isn't there - there's a time

period where you have to react to it?

A.   There's going to be...

Q.   The car in front of you slows down?

A.   There's going to be reactionary time

between seeing the actual brake lights...

Q.   Uh-huh (affirmative).

A.   ...and stepping on the brake pedal.

Q.   Correct.  That's...

A.   But I think that's very, I mean,

that's minimal, I would assume.

Q.   But is it possible for someone to

temporarily get too close to a vehicle while they're

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1     reacting to that?

2          A.   I think that if you get, my personal

3     opinion is that if you get too close to the vehicle

4     based on that short reaction time, then you're too

5     close.

6          Q.   Okay.

7          A.   You need, you need to have enough time

8     to be able to see the brake lights and get stopped.

9     That's the nature of how accidents occur, is people

10    think, oh, I'm, I've got plenty of time.  You know, I

11    mean, I've worked a ton of crashes like, "I can't

12    believe I hit them.  I thought I had, I thought I had

13    plenty of room to get stopped."

14         Q.   Is there any guidelines that you're

15    given as far as speed in relation to the car in front

16    of you?  Is there any...?

17         A.   I guess I don't really know what

18    you're asking.

19         Q.   Is there a - in the driver's manual it

20    states that for every ten miles an hour at a certain

21    speed you need to be, a certain distance you need to

22    be behind.

23         A.   Yeah, but again, that's just -

24    everything is based on so many different factors that

25    go into that.  I mean, the grade of the road, if

**Barringer Court Reporting**
**P.O. Box 8035, Gray, TN - 423-477-7844**

1  you're going up hill or down hill or, like I say,

2  again, if it's wet or dry or - so I think it's,

3  everything is subjective to the actual, at that

4  moment what the conditions of that roadway, that

5  actual time period of when this is happening.  Is

6  that - did I answer your question?

7          Q.   I - that's fine.  When you pulled over

8  Mr. Tullock you ran his driver's license?  Is that

9  correct?

10         A.   I'm sure I probably did.  Yes, Sir.

11         Q.   And you were aware that he had a CDL?

12         A.   Okay, yeah.  Not now, but I guess at

13 the time I would have been.

14         Q.   And were you aware that Mr. Tullock

15 had a good safety record on his CDL?

16         A.    You know, the nature of the CDLs, is

17 those guys really try to keep their records clean, so

18 I don't recall that, but it doesn't surprise me,

19 because in order to keep their job and that CDL,

20 they're going to have to have - most companies if you

21 get very many violations at all you're gonna, you're

22 gonna lose your job, so most guys with CDLs you're

23 going to have a fairly good, clean driving history.

24         Q.   Okay.  And did Mr. Tullock tell you

25 that he was, that was his nervousness, was the fact

that he did have a good CDL record and that he...?

A.   I don't recall that, but I - let me tell you something about truck drivers and the guys with the CDLS, they are quick to tell you, I do not need a ticket.  I've got a good driving record, and this, you know, anything you can do to help me out would be greatly appreciated.  So him saying that at the time, I don't recall, but I'd - it wouldn't surprise me if he would have said something like that.

Q.   No other questions, Your Honor.

MS. HEBETS:  No additional questions, Your Honor.

THE COURT:  Thank you, Trooper.

TROOPER STIELOW:  Thank you, Sir.

THE COURT:  Well, let me ask you just one quick question.

TROOPER STIELOW:  Okay.

EXAMINATION BY THE COURT:

Q.   Now you had heard from Agent Wilhoit?

A.   Yes, Sir.

Q.   You were looking for this vehicle?

A.   I don't believe I was looking specifically for this vehicle.  No, Sir, I - you know, while working out there if I would have seen the vehicle, then that would have, you know, triggered a, like oh, that's my - that might be the vehicle, you know,...

Q.   Okay.  So you...?

A.   ...Chucky was talking about.

Q.   All right.  So when you affected this traffic stop you were unaware at that time that was the vehicle that Agent Wilhoit was interested in?

A.   I, I was aware that it was a vehicle close to the description that he had given me.  You know, but sometimes, you know, the description will be, you know, look - I mean...

Q.   Well, I guess, what I...

A.   A gold sedan, you know, well, there's a lot of gold sedans.

Q.   Was your, was your traffic stop pretextual because you were attempting to assist

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1   Agent Wilhoit, or was this, was your motivation

2   purely and alone at that point the following too

3   closely?

4              A.   Absolutely it was the following too

5   closely.

6              Q.   Thank you.

7              MS. HEBETS:  Your Honor, may this witness

8   be excused?

9              THE COURT:  Yes, Sir, and watch the

10  weather.  I've always wanted to tell a trooper that.

11             TROOPER STIELOW:  Thank you, Your Honor.

12

13  THIS CONCLUDES THE TESTIMONY OF TROOPER JACOB STIELOW

14  AS PRESENTED IN THIS MATTER.

15

16

17

18

19

20

21

22

23

24

25

**Barringer Court Reporting**
**P.O. Box 8035, Gray, TN - 423-477-7844**

1　　　　　　THE COURT:  Anything else?

2　　　　　　MS. HEBETS:  Nothing else on that motion,

3　　Your Honor.

4　　　　　　MR. REACH:  Nothing else, Your Honor, on

5　　that motion.

6　　　　　　THE COURT:  Well, for whatever it's worth,

7　　the Tennessee Court of Criminal Appeals in 2002

8　　addressed the question of whether or not the

9　　following too closely statute was unconstitutionally

10　　vague, and the Court of Criminal Appeals said no.  So

11　　I just - and frankly (PAUSE).  Yeah, I think the

12　　Sixth Circuit has laid this issue to rest.  Yeah, the

13　　Sixth Circuit settled this issue.  US V Walton, 58

14　　Fed. Appx. 753, 2007.  They also rely upon our recent

15　　decision, US V Sanford, yada, yada, yada in which we

16　　upheld a probable cause ruling for following more

17　　closely than is reasonably prudent in violation of

18　　TCA 58-8-124, and quoting from that case, "Although

19　　the statute does not define reasonably prudent, the

20　　Tennessee Driver's Manual provides that a vehicle

21　　should maintain at least one car length for every ten

22　　miles per hour.  We conclude that a panel opinion

23　　further addressing these issues would serve no

24　　jurisprudential purpose."  So there it is.  What's

25　　next?

**Barringer Court Reporting**
**P.O. Box 8035, Gray, TN - 423-477-7844**

1    MS. HEBETS:  I, there are two motions left

2    with witnesses, and whichever the Court wants to take

3    first is fine with the United States.

4    THE COURT:  Well, let's see.  Mr. Reach,

5    does that exhaust your panoply of Motions to

6    Suppress?

7    MR. REACH:  No, Your Honor.  I have one of

8    the remaining motions, Your Honor.

9    THE COURT:  Okay.  Well, I'm just here.

10   Let's do Mr., Mr. Tullock's.  This is a Motion to

11   Suppress statements to the agents when they arrived

12   at the house, right?

13   MS. HEBETS:  Correct.

14   MR. REACH:  Yes, Your Honor.

15   THE COURT:  Okay.

16   MS. HEBETS:  The United States has two

17   witnesses, Special Agent Greg Smith of the FBI and

18   Special Agent Jim Williams of the TBI.

19   THE COURT:  All right.  Mr. Reach, do you

20   have any witnesses that you would call?

21   MR. REACH:  No, Your Honor.

22   THE COURT:  Okay.  Do you request the Rule?

23   MR. REACH:  Yes, Your Honor.

24   THE COURT:  Okay.  Call a witness and

25   I'll...

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1          MS. HEBETS:  The United States would call

2     Special Agent Greg Smith first since Mr. Williams is

3     closer to the door.

4          THE COURT:  Okay.

5

6     (WITNESS IS SWORN)

7

8          CLERK:  Please be seated.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           SPECIAL AGENT GREGORY SMITH, after first

2     being duly sworn, testified as follows:

3

4           DIRECT EXAMINATION BY MS. HEBETS:

5

6           Q.   Can you state your name, please?

7           A.   Gregory Smith.

8           Q.   And common spelling?

9           A.   It is.

10          Q.   All right.  And how are you employed?

11          A.   I'm a Special Agent with the Federal

12    Bureau of Investigation.

13          Q.   How long have you been with the FBI?

14          A.   Over twelve years.

15          Q.   And what are your responsibilities

16    with the FBI?

17          A.   Primarily I'm charged with

18    investigating crimes and violation of Title 21, which

19    is the federal drug offenses.

20          Q.   And how long have you been doing that?

21          A.   Exclusively for the past seven, almost

22    eight years.

23          Q.   Now I want to ask you about an

24    investigation you participated in back in 2000...end

25    of 2009, beginning of 2010 and through 2010, actually

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1    into 2011.  Are you familiar with this investigation?

2         A.   I am.

3         Q.   And are you familiar with an

4    individual by the name of Rodney Tullock?

5         A.   I am.

6         Q.   And he's in the Courtroom seated at

7    the first table, correct?

8         A.   He is.

9         Q.   Did you have occasion in October of

10   last year to interview or to meet with Mr. Tullock?

11        A.   I did.

12        Q.   Could you tell the Court what the

13   circumstances were of that meeting?

14        A.   Yes, Ma'am.  Myself and ASAC Williams

15   with the TBI went to Mr. Tullock's residence after 9

16   but before ten o'clock in the morning, and knocked on

17   his door, and asked to speak with him.  I believe his

18   girlfriend actually answered the door first, and we

19   asked if Mr. Tullock was present.

20        THE COURT:  This is Mr. Tullock's house?

21        A.   It is.

22        THE COURT:  Where is it?  I'm sorry?

23        A.   I believe it's 925 Walker Town Road in

24   Afton, Tennessee.  We knocked, I knocked - he knocked

25   on the door.  I believe his girlfriend answered the

door, and we asked if Mr. Tullock was at the
residence, and she indicated that he was, and when he
came to the door we asked if we could speak to him.
He said that we could and invited us into the
residence.

Q.    Was it just the two of you?

A.    It was just the two of us.

Q.    Special, or Assistant Special Agent in
Charge?  Is that...?

A.    Correct.

Q.    ...correct?  Mr., or Williams,
correct?

A.    Correct.

Q.    Okay.  Were you in uniform?

A.    I was dressed casually.  I don't have
a uniform per se.  I was not in a suit.  I was in
probably khakis or jeans and a collared shirt.

Q.    And did you have your gun on you?

A.    I had my weapon, but it wasn't out.
It was not visible.

Q.    What about ASAC Williams?

A.    I assume he had a weapon, but I don't
recall seeing it, so I don't believe it was visible.

Q.    So what happened - and Mr. Tullock
invited you into the house.  What happened then?

1    A.    He asked us to come into the first

2    room on the left, which I would call the TV room, and

3    there's two couches and a television there.  The

4    television was on.  We sat down, and ASAC Williams

5    basically - I'm sorry.  Assistant Special Agent in

6    Charge Williams basically laid out why we were there,

7    and that we wished to speak to Mr. Tullock, and that,

8    that some of the things we may talk about may be

9    somewhat embarrassing or private, and if Mr. Tullock

10   would like, we could go for a ride in ASAC Williams'

11   vehicle or we could - if he, if he was comfortable he

12   could ask his girlfriend maybe to go shopping or to

13   give us some privacy so that we could talk to him, so

14   that he would feel more comfortable in discussing

15   some of the issues that we were going to bring up.

16   But we left it up to him decide what he wanted to do.

17        Q.    And how was Mr. Tullock acting at this

18   time?  Was he...?

19        A.    He seemed nervous, which is not

20   uncommon.  When a federal agent and a state agent

21   come to your door and want to talk to you there's a

22   tendency for someone to be nervous.

23        Q.    Did he ever tell you that he didn't

24   want to talk with you?

25        A.    No, Ma'am.

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1    Q.   Did he ever tell you that he wanted

2    you to leave his house?

3    A.   No, Ma'am.

4    Q.   And, just for clarification, he was

5    not under arrest?

6    A.   That's correct.

7    Q.   And you, neither you or Assistant

8    Special Agent in Charge Williams read him his rights

9    per Miranda?

10    A.   Correct.

11    THE COURT:  I'm sorry?

12    Q.   Neither of them read him his rights

13    per Miranda, and the answer is correct, right?

14    A.   We did not read him his rights.

15    Q.   All right.  Now did Mr. Tullock agree

16    to speak with you?

17    A.   He did.

18    Q.   And did he resolve whether he wanted

19    to speak with you in the residence or go with you in

20    a vehicle or what to do with his girlfriend?

21    A.   He said that he would ask her maybe to

22    go shopping, and he left the room for a short period

23    of time and had a conversation with her outside of

24    our presence.  Came back in and indicated that she

25    was going to shopping.  She came in and said goodbye

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1    to us and to Mr. Tullock, and then left the

2    residence.

3         Q.   And then what happened after that?

4         A.   ASAC Williams and myself began to ask

5    Mr. Tullock questions regarding his relationship with

6    one of the co-conspirators in this investigation, and

7    Mr. Tullock basically, basically detailed his

8    relationship with Mr., with one of the co-

9    conspirators and his criminal involvement with him.

10        Q.   And Mr. Tullock also discussed his

11   criminal activity?

12        A.   Correct.

13        Q.   In the distribution of oxycodone?

14        A.   That is correct.

15        Q.   At any time during the conversation

16   did either you or Assistant Special Agent in Charge

17   Williams raise your voice to Mr. Tullock?

18        A.   No, Ma'am.

19        Q.   Threatened him in any way?

20        A.   The conversation was very similar in

21   tone to the one we're having right here.

22        Q.   Okay.  Did Mr. Tullock appear to be

23   understanding what you were asking him?

24        A.   He did.

25        Q.   Was he at all under the influence of

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1   anything that you were aware of?

2          A.   Not to my knowledge, and not that I

3   could ascertain by his demeanor.

4          Q.   And he voluntarily answered your

5   questions?

6          A.   He did.

7          Q.   And provided the information?

8          A.   He did.

9          Q.   And in fact, he agreed to cooperate

10  with law enforcement at that time?

11         A.   The interview went so well that ASAC

12  Williams and I basically asked Mr. Tullock if he

13  would consider cooperating against some of his co-

14  defendants in the process of gathering further

15  evidence, and he seemed amenable to that, and we

16  discussed what possible scenarios that might entail

17  where he would be involved.

18         Q.   And what happened after that?

19         A.   We left that meeting, and then we

20  agreed to meet - the meeting occurred on a Friday,

21  and we agreed to meet the following week.  Myself and

22  ASAC Williams wanted it to occur earlier in the week,

23  but Mr. Tullock, I believe, had something going on,

24  so we didn't meet until Wednesday or Thursday of the

25  following week.

1    Q.    And what happened at that meeting?

2    A.    We met at a park in Newport, and

3  myself, ASAC Williams and two other TBI Agents, Agent

4  McNamara and Agent Thompson, I believe, were present.

5  Mr. Tullock showed up.  He got into Mr., or ASAC

6  Williams' vehicle, which is a four wheel truck, with

7  myself, ASAC Williams and another TBI Agent.  I

8  believe Agent McNamara and Thompson were in the

9  conversation intermittently, both were in there

10 intermittently at this time.  And Mr. Tullock had

11 some concerns about cooperating with the Government

12 at that point.  He was nervous, and that's not

13 uncommon in those situations, so myself and ASAC

14 Williams had a lengthy discussion with him about his

15 concerns to see if we could overcome them or address

16 them.  We were not able to do that, and he left.

17    Q.    So he voluntarily showed up at the

18 second meeting with you and other agents?

19    A.    He did.

20    Q.    And when he said he wasn't no longer

21 interested you allowed him to leave?

22    A.    Correct.

23    Q.    Okay.  I have no further questions at

24 this time, Your Honor.

25

CROSS EXAMINATION BY MR. REACH:

Q.   Agent Smith, when you arrived did both of you identify yourselves as agents of the Government?

A.   Most definitely.

Q.   Okay.  And did you show your badges to him?

A.   I showed my credentials...

Q.   Credentials?

A.   ...with my picture, and it says Special Agent for the Federal Bureau of Investigation.

Q.   Okay.  And at any time was he told that he was a suspect in a conspiracy?

A.   He was told in broad terms that he'd been involved with Mr. McMahan, specifically a traffic stop, which I think we'd detailed earlier here, and other things that would lead him to believe that he was being investigated, yeah.

Q.   Okay.  And he was - you also told him that the traffic stop was partially, you were behind it?

A.   ASAC Williams referenced the traffic stop where he was stopped and had pills with him, in

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

his possession.

Q.   Okay.  When you came to him and you first started talking to him, did you ever tell him that this is a voluntary conversation?

A.   ASAC Williams handled the conversation.  I recall him saying that this was his opportunity basically to help himself, and then if he didn't want to talk to us that was his choice.

Q.   Okay.  Was he told at any time that he could tell you to leave?

A.   I don't remember those specific words, but we did ask to be invited in and basically were there at his grace at that point, and asked, you know, what would he be comfortable with as the interview continued forward.

Q.   Okay.  Well, was he ever told the words "If you tell us to leave we'll leave"?

A.   I don't remember that specific statement, but I do know, as I said, we made indications that this was a voluntary interview.

Q.   What other indications did you make this was voluntary interview?

A.   This was his opportunity to help himself out.  If he didn't want to talk to us he didn't have to.

1     Q.   Okay.

2     A.   We'd like to continue to talk to you

3 further.  We have a couple of options.  What would

4 you be more comfortable with, things of that nature.

5     Q.   Okay.  And then you gave him two

6 options essentially; he could either go in the car

7 with you or with - inside your car, or he could ask

8 his girlfriend to leave the house?

9     A.   Right.

10    Q.   Either or, and rather than going in

11 the car with you he told his girlfriend to leave?

12    A.   He asked her to go shopping, yes.

13 Well, I wasn't present for the conversation.  He told

14 her something.

15    Q.   But he - she left, one way or the

16 other?

17    A.   Right.

18    Q.   Do you recall, was this early in the

19 conversation that you told him...?

20    A.   It was fairly early in the

21 conversation, yes.  It was within the first few

22 minutes of coming into the house.

23    Q.   Okay.  And was the only offer made to

24 him to go for a ride in one of your vehicles?

25    A.   Correct.

Case 2:11-cr-00081-JRG-MCLC  Document 432  Filed 02/09/12  Page 43 of 73  PageID #:
3131

1    Q.   Okay.  You weren't going to get in

2  his?

3    A.   Probably not.  No, Sir.

4    Q.   Okay.  And after the girlfriend left

5  the residence, and you began discussing, was that

6  when he was told the real specifics about what he was

7  there for?  What you were there for?

8    A.   Yeah, we, we laid out that, hey, this

9  is what we're here to talk to you about, certain

10  individuals, by name, and asked him how he knew them

11  and his relationship with them.

12    Q.   Okay.  Did Mr. Tullock ever tell you

13  that he had come in off the road that morning at any

14  point in time?

15    A.   I recall that he was sleeping, or he

16  appeared to have been.  He come out of the bedroom,

17  so I assume he was sleeping, but I don't recall him

18  telling that he'd just come off the road, no.

19    Q.   Was he sleepy during your

20  conversation?

21    A.   He seemed completely lucid, Sir.

22    Q.   Okay.  Was he ever threatened with

23  arrest?

24    A.   Absolutely not.

25    Q.   Okay.  Was he ever told that if he

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1    didn't talk with you that it would be bad for him to

2    not talk with you?

3              A.   I don't remember those specific words,

4    but I know that we, we let him know that we knew a

5    lot of his activities, so I would assume a prudent

6    man would think that he might have some negative

7    consequences.

8              Q.   Okay.  All right.  Where were you, and

9    now I know you said this was in sort of a TV room, as

10   you called it, inside of his house.

11             A.   Yes, Sir.

12             Q.   Do you recall where the two of you

13   might have been sitting in relation to Mr. Tullock?

14             A.   I do.

15             Q.   Where were you?

16             A.   If you come into his house through the

17   front door, there's a short wall, and there's a door

18   to the left.  That's the room that we went into.  As

19   you go into that room, at that time there was a couch

20   along that wall that I described, and that's where I

21   sat.  There was a coffee table, and then there was a

22   shorter couch perpendicular to the longer couch, and

23   that's where he and ASAC Williams sat.

24             Q.   Okay.  Were you each of you, were each

25   of you on one side of him?  Is that...?

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1    A.   It was more of a, right - I was more

2    directly across from him, based on how the couches

3    were sitting, my angle of my body, and ASAC Williams

4    was next to him.

5    Q.   Okay.  Was he shown anything, such as

6    pictures, video, anything like that?

7    A.   No.

8    Q.   Okay.  How long was the conversation?

9    A.   As I recall, it wasn't more than an

10   hour, and part of that time, as I said, was at the

11   end we were discussing what his options might be if

12   he didn't - with regards to cooperation and giving

13   him potential scenarios as to what might happen.

14   Q.   Was he told that he could say no to

15   cooperation?

16   A.   Most definitely.

17   Q.   No other questions, Your Honor.

18   MS. HEBETS:  Just one follow up, Your

19   Honor, that I forgot to ask.

20

21

22

23

24

25

REDIRECT EXAMINATION BY MS. HEBETS:


Q.   Agent Smith, if, when you knocked on the door, Mr. Tullock had said I'm not interesting in talking, what would you have done?

A.   Left.

Q.   Nothing further, Your Honor.


THIS CONCLUDES THE TESTIMONY OF SPECIAL AGENT GREGORY SMITH AS PRESENTED IN THIS MATTER.


MS. HEBETS:  The United States calls Special Agent, or Assistant Special Agent in Charge Jim Williams.


(WITNESS IS SWORN)


CLERK:  Please be seated.

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1        AGENT JIM WILLIAMS, after first being duly

2    sworn, testified as follows:

3

4        DIRECT EXAMINATION BY MS. HEBETS:

5

6        Q.   Can you state your name for the

7    record, please?

8        A.   My name is Jim Williams.

9        Q.   And common spelling of first and

10   last...?

11       A.   W-I-L-L-I-A-M-S.

12       Q.   How are you employed?

13       A.   I'm employed by the Tennessee Bureau

14   of Investigation.

15       Q.   And what is your title?

16       A.   Assistant Special Agent in Charge for

17   the Upper East Drug Investigative Division.

18       Q.   What are those responsibilities?

19       A.   It's basically supervising the, the

20   agents in the drug division on their day to day

21   operations and investigations.

22       Q.   And...?

23       A.   Assisting them on investigations and

24   filling in as needed.

25       Q.   So you also participate in

1  investigations?  You're not just solely a supervisor?

2          A.    That's correct.

3          Q.    Okay.  And how long have you been

4  working as a law enforcement agent in drug

5  trafficking investigations?

6          A.    It'll be twenty years February 1st.

7          Q.    Now did you participate in some degree

8  in an investigation involving Rodney Tullock and

9  others?

10         A.    Yes, Ma'am.

11         Q.    And specifically I want to jump right

12 to October 29th 2010.  Do you recall that date?

13         A.    Yes, Ma'am.

14         Q.    And were you with Special Agent Smith

15 of the FBI on that date?

16         A.    Yes, I was.

17         Q.    Okay.  What, what - can you tell the

18 Court what happened on that date as it relates to Mr.

19 Tullock?

20         A.    Agent Smith and I traveled to Mr.

21 Tullock's residence on Walker Town Road here in

22 Greene County to attempt to talk to him and try to

23 interview him regarding the William McMahan

24 investigation.

25         Q.    Now were you intending to arrest him

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1  on that date?

2          A.  No, Ma'am, we were not.

3          Q.  Okay.  So what happened when you got

4  to the house?

5          A.  We knocked on the door.  I don't

6  recall if Mr. Tullock or the female come to the door

7  first, but we were, we were invited inside.  We wound

8  up speaking to Mr. Tullock just inside the doorway.

9  Seems like there was a stairwell there besides it and

10  rooms off to each side.  We told him, told him we

11  needed to talk to him, and that we, you know, it was

12  serious information we had to discuss with him.  I

13  don't recall if he may have indicated that he didn't

14  want to speak in front of his wife or girlfriend; I'm

15  not sure what, what the relationship is, however, it

16  was eventually determined that she would, she would

17  leave the residence for a period of time, I think, to

18  go shopping or run some errands or something, and

19  then Agent Smith and Mr. Tullock and I sat down in

20  the living room of his residence and continued the

21  discussion.

22          Q.  Let me ask you.  Back when you were

23  first talking to Mr. Tullock and you explained that

24  you wanted to ask him some questions, did you tell

25  him he was under arrest?

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1    A.    No, Ma'am.

2    Q.    Did you tell him that he had to answer

3    your questions?

4    A.    No, Ma'am.

5    Q.    Did you tell him that, or did you

6    advise him of his Miranda Rights?

7    A.    No, Ma'am.

8    Q.    Did you tell Mr. Tullock - what did

9    you tell - let me phrase it more open ended.  What

10   did you tell him with respect to his ability to talk

11   or not talk?

12   A.    Told him, told him he didn't have to

13   talk to us, but we did tell him that, you know, that

14   he was potentially facing some, some problems down

15   the road, and this would be a good opportunity for

16   him, you know, to cooperate if he, if he chose to.

17   But he was told he did not have to speak to us.

18   Q.    And did Mr. Tullock agree to speak to

19   you?

20   A.    Yes, Ma'am.

21   Q.    All right.  Did he ever tell you I'm

22   not interested in talking?

23   A.    No, Ma'am.

24   Q.    Okay.  On that date, if he had told

25   you I'm not interested in talking, what would you

1      have done?

2              A.   We would have, we would have left.

3              Q.   So Mr. Tullock and you and Agent Smith

4      sit down in the living room and you speak to him

5      about his involvement in this drug trafficking,

6      correct?

7              A.   Yes, Ma'am.

8              Q.   And he provided information?

9              A.   Yes, he did.

10             Q.   During - how long did that

11     conversation last?

12             A.   I don't recall exactly.  I, I would

13     estimate an hour, maybe an hour and a half.  It

14     wasn't a real long interview or anything like that.

15             Q.   At any point during that interview did

16     Mr. Tullock tell you he was, he didn't want to answer

17     any more questions?

18             A.   No, Ma'am.

19             Q.   Or he didn't want to talk any more?

20             A.   No, Ma'am.  As a matter of fact, we,

21     we actually made arrangements to talk in the future.

22     When we left there we felt like there was a strong

23     possibility he would be, he would want to continue

24     the conversation in the future.

25             Q.   Okay.  Did you or Agent Smith ever

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1    threaten him in any way?

2              A.    No,...

3              Q.    Verbally?

4              A.    No, Ma'am.

5              Q.    Physically?

6              A.    No, Ma'am.

7              Q.    Did you ever draw your weapon?

8              A.    No, Ma'am.

9              Q.    Was your weapon visible?

10             A.    No, Ma'am, it would not have been

11   visible.

12             Q.    Okay.  Did Mr. Tullock appear to

13   understand what was going on?

14             A.    Yes, he did.

15             Q.    Did he appear to - was he, appear

16   intoxicated at all?

17             A.    No, Ma'am.

18             Q.    Under the influence of any drugs of

19   any kind?

20             A.    Didn't appear so, no.

21             Q.    And you said that Mr. Tullock agreed

22   to meet with you at a later date, correct?

23             A.    Yes.

24             Q.    And did he, in fact, meet with you?

25             A.    Yes, he did.

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1      Q.   And what was the circumstances, or

2  what happened there?

3      A.   When we left the meeting on the 29th

4  we had, or during the meeting on the 29th we'd had

5  discussions about him providing substantial

6  assistance in this investigation, and I'd given, I

7  think Agent Smith and I both had given him our phone

8  numbers, however I think he contacted me the

9  following week, and we agreed to meet in Newport.

10  The purpose, I felt like that the purpose of the

11  meeting was going to be to attempt further

12  investigation toward Mr. McMahan.  We met with him at

13  a city park there in Newport.  Myself and Agent Smith

14  and Agent McNamara met with him in my vehicle, and we

15  discussed did he have more questions about the way,

16  you know, the situation, what we were expecting from

17  him in terms of his cooperation and all that.  I

18  don't recall how long we spoke with him, but by the

19  end of it he basically, he basically said, "Fellows,

20  I'm not going to do it."  And then he got out of the

21  truck and left, and I assume went back to

22  Greeneville.

23      Q.   You didn't, at that point when he said

24  he didn't want to do it, you didn't threaten him in

25  any way?

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1          A.    No.

2          Q.    Did you have any further contact with

3    him?

4          A.    No, Ma'am.  I don't recall having

5    spoken with him since.

6          Q.    Okay.  I have no further questions.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Barringer Court Reporting**
**P.O. Box 8035, Gray, TN - 423-477-7844**

CROSS EXAMINATION BY MR. REACH:

Q.   Agent Williams, when you went out to Mr. Tullock's house he was a suspect in a conspiracy, was he not?

A.   Yes, he was.

Q.   And you went out there to talk with him about his dealings with William McMahan, is that correct?

A.   That was, that was what we were hoping would happen.

Q.   Okay.  And just to clarify, when you first made contact with Mr. Tullock, did you say that you had serious information to talk with him about? I thought that, that was the words that you used?

A.   I may have used that in my previous testimony.  I don't, I don't recall if those were my exact words or not, however it would have, it wouldn't surprise me if I did tell him it was serious, because basically it would have been.  If those charges were ultimately levied against they would be serious charges.

Q.   Okay.

A.   So it would not have surprised me to have used those terms.

1          Q.   Was he ever told that he would be

2     arrested if he didn't talk with you?

3          A.   No, Sir.

4          Q.   Or that he would be charged with

5     something if he didn't talk with you?

6          A.   No, Sir, absolutely not.

7          Q.   And at some point in time was he given

8     an option to leave in a car with you?  Do you recall

9     that?

10          A.   He, he expressed reluctance to speak

11     in front of, and there again, I don't know if it's -

12     the, the lady, and I think we offered.  Well, you

13     know, we can go, we can drive down the road and find

14     a place and sit and talk, which is not uncommon to

15     do, or we can stay here and talk.  And then I think

16     he asked her to leave and, and give us, give us

17     privacy for him to talk, because I recall sitting in

18     the living room while she was getting ready, and

19     basically we just made small talk until she left, and

20     then once, once she left you could tell he was ready

21     to talk, and that's when we started the interview.

22          Q.   And the total conversation lasted

23     about an hour?

24          A.   That's...

25          Q.   Right around?

1      A.    ...to the best of my recollection.

2      Q.    Okay.

3      A.    It could be more, could be less.

4      Q.    Was he ever, was it ever related to

5  him that if he didn't talk to you something worse

6  could happen to him other than what he was already

7  suspected of?

8      A.    No, Sir.  Absolutely not.

9      Q.    Where were you sitting in relation to

10  Mr. Tullock while you were inside his house?

11      A.    I was sitting beside him on the couch.

12      Q.    Okay.  And where was Agent Smith at

13  that time?

14      A.    He was across the room on a - there

15  was a - it was either a footstool or an ottoman-type

16  or some, some type of a chair across the living room.

17      Q.    Okay.  At any point in time was he

18  told that this is a voluntary conversation; you can

19  ask us to leave at any time?

20      A.    Told him he didn't have to talk to us

21  if he didn't want to talk to us.  I don't recall if

22  I, if I told him that he could tell us to leave, but

23  he was told that he didn't have to speak with us.

24      Q.    No other questions, Your Honor.

25      MS. HEBETS:  No further questions, Your

1    Honor.

2

3    THIS CONCLUDES THE TESTIMONY OF ASSISTANT SPECIAL

4    AGENT JIM WILLIAMS AS PRESENTED IN THIS MATTER.

5

6              THE COURT:  Any other witnesses?

7              MS. HEBETS:  No, Your Honor.

8              MR. REACH:  No, Your Honor.

9              THE COURT:  This brings us to Mr. Leonard's

10   Motion to Suppress.

11             MR. REACH:  Your Honor, may Mr. Tullock and

12   I be excused?  I need to get to Johnson City for

13   another court appearance.

14             THE COURT:  No problem with me.

15             MR. REACH:  Thank you, Your Honor.

16             THE COURT:  Ms. Hebets, you got any

17   problems with that?

18             MS. HEBETS:  No, Your Honor.

19             THE COURT:  Okay.

20             MR. REACH:  Thank you, Your Honor.

21             THE COURT:  Are we ready to proceed on this

22   motion?

23             MS. HEBETS:  Yes, Your Honor.

24             THE COURT:  Who's going to testify.

25             MS. HEBETS:  Multiple people, Your Honor.

Case 2:11-cr-00081-JRG-MCLC   Document 432   Filed 02/09/12   Page 59 of 73   PageID #: 3147

1    Basically everyone who's sitting back there is a

2    potential witness except for Agent Williams.

3            THE COURT:  I'm sorry.  Except for who?

4            MS. HEBETS:  Special Agent Williams.

5            THE COURT:  Well, is the Rule requested?

6            MR. LEONARD:  Yes, Your Honor.

7            THE COURT:  Pick a witness, Ms. Hebets, and

8    let's excuse the rest.

9            MS. HEBETS:  The United States calls Kevin

10   Poe.

11

12   (WITNESS IS SWORN)

13

14           CLERK:  Please be seated.

15

16

17

18

19

20

21

22

23

24

25

**Barringer Court Reporting**
**P.O. Box 8035, Gray, TN - 423-477-7844**

1            KEVIN POE, after first being duly sworn,

2      testified as follows:

3

4            DIRECT EXAMINATION BY MS. HEBETS:

5

6            Q.   Can you state your name for the

7      record?

8            A.   Kevin Poe.

9            Q.   How do you spell your last name?

10           A.   P-O-E.

11           Q.   And how are you currently employed

12     right now?

13           A.   I work for the Jefferson County

14     Circuit Court.

15           Q.   How long have you been in that job?

16           A.   A little over three months.

17           Q.   Okay.  Prior to that where were you

18     working?

19           A.   The Jefferson County Sheriff's

20     Department.

21           Q.   And how long - well, what was your

22     role at the Sheriff's Department?

23           A.   I was a deputy, patrol deputy.

24           Q.   And how long were you with the

25     Sheriff's Department?

A.    Four years.

Q.    And I want to call your attention back to May 1st of 2010.  Well, let me back up.  As a deputy with Jefferson County what were your, what were your typical responsibilities?

A.    General public safety, which would include responding to calls from the public and enforcing traffic laws around the area.

Q.    Okay.  Now I call your attention back to May 1st of 2010.  Do you recall that date?

A.    Yes.

Q.    And how were you employed on that date?

A.    As a deputy with the Sheriff's Department.

Q.    Okay.  Do you remember a request to assist in an investigation on that date?

A.    I do.

Q.    And who contacted you about that?

A.    Drug Task Force Agent Todd Coleman.

Q.    Okay.  Were you on duty already?

A.    I was.

Q.    And were you in a marked patrol car?

A.    I was.

Q.    And full uniform?

1   A.   Yes, Ma'am.

2   Q.   All right.  Based on what Mr., or

Agent Coleman told you, what, what were you intending

to do that day?

5   A.   The information I was given that there

was a red GMC Silverado coming eastbound on

I-40, that if I could develop my own PC for the stop

to do so.

9   Q.   Did you at any point make contact with

or observe this red, a red GMC pickup truck?

11   A.   I did.

12   Q.   And where would that have been?

13   A.   I-40 at Exhibit 417, just west of

Exhibit 417.

15   Q.   And where were you, do you recall,

when you observed that car, truck?

17   A.   Yes, Ma'am.  There's an on ramp, the

eastbound on ramp, shortly past the on ramp I was

stationary on the median, on the edge of the road, on

the shoulder.

21   Q.   Okay.  And what, if any, equipment did

you have in your patrol vehicle?

23   A.   I had my radar, front and rear, that

was capable of getting the speed moving and

stationary, both front and rear.

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

Q.   Okay.  So if I understand, if your
vehicle is moving you can still get a radar number or
target on a vehicle, another moving vehicle?

A.   Correct.

Q.   And if you're stationary you can also
use that same radar to get a speed estimate on, or a
speed on a moving vehicle?

A.   Correct.

Q.   All right.  Were you operating that
radar on May 1st?

A.   I was.

Q.   Okay.  And did you, in fact, use the
radar on the red pickup truck?

A.   I did.

Q.   Can you tell the Court what, based on
the radar, what the speed of the pickup truck was?

A.   The first thing I did before
activating the radar I attempt to, to estimate the
speed of the vehicle to be over the posted speed
limit, which I did.  I couldn't if the vehicle that I
was told, that was described to me was the vehicle or
not, and I estimated the vehicle's speed to be above
the posted speed limit, and then confirmed that with
the radar at 73 mile an hour in a posted 65 mile an
hour zone.

1        Q.   So it's 65 miles per hour there?

2        A.   Yes, Ma'am.

3        Q.   And were you facing in the same

4   direction the car was traveling?

5        A.   I was facing eastbound.  Yes, Ma'am.

6        THE COURT:  I'm sorry.  The radar confirmed

7   the speed at what?

8        A.   Seventy-three miles an hour.

9        Q.   In 65 mile per hour zone?

10        A.   Yes, Ma'am.

11        Q.   All right.  So when you confirmed that

12   speed on the radar what did you do?

13        A.   I attempted to, I let the vehicle pass

14   me, and there was ample room to get behind the

15   vehicle.  I paced it for a short distance to also

16   confirm the speed to be above 65 mile an hour.  Once

17   I did that and I was comfortable I initiated my

18   lights and sirens and attempted to make a traffic

19   stop.

20        Q.   So you also paced the car.  Could you

21   explain to the Court what that entails?

22        A.   The police vehicles that we use have

23   calibrated speedometers to be accurate within

24   whatever the Department specifies, and I was behind

25   the vehicle a short distance.  And if I maintain a

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

speed of 65 mile an hour and the vehicle continues to
pull away from me, I will match the speed of the
vehicle without closing the distance to my best
ability, and it was way, it was over 70 mile an hour
that that was pacing.

Q.   Okay.  And this is a technique that
you, you learned and used daily in your official...?

A.   I was not trained on it in the
Sheriff's Department, but prior to that, from 2001 to
2006 I was a military police officer, which I was
trained and used multiple times.

Q.   Okay.

THE COURT:  I submit pacing a car requires
no training.

Q.   All right.  So, so at this point you
had both the pace speed and a radar speed, correct?

A.   Correct.

Q.   Exceeding the 65 mile per hour speed
limit?

A.   Yes, Ma'am.

Q.   And you turn on your blue lights and
attempt to make a traffic stop?

A.   That is correct.

Q.   And what happened when you turned on
the lights and attempted to traffic stop the vehicle?

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1     A.   There's a general response when blue
2   lights are activated that based on my experience
3   occurs, and that is usually either brake lights
4   abruptly or a blinker or I, I can usually see the
5   side view mirror and the driver will look and
6   acknowledge that I'm behind them and pull over.  This
7   vehicle did not do that.  Matter of fact, I recall
8   that Mr. Rogers was wearing a ball cap, because I
9   could see his eyes look at me in the rearview mirror
10  and kind of shake his head, and at that point the -
11  my, my risk factor, my meter inside me continued, you
12  know, starts to rise, and there was no action from
13  the vehicle but it continued to travel eastbound, and
14  I allowed the distance between our vehicles to
15  increase, because during the nature of traveling at
16  high speeds on the Interstate it's not uncommon for a
17  collision to occur.  So I let the speed, or the
18  distance increase a little bit, and we continued
19  eastbound.

20     Q.   So the Defendant, and you identified
21  him as Mr. Rogers, he's sitting in the Courtroom
22  here, correct,...?

23     A.   He is.  Yes, he is.

24     Q.   ...made no attempt to stop his car?

25     A.   Absolutely not.

**Barringer Court Reporting**
**P.O. Box 8035, Gray, TN - 423-477-7844**

Q.   How long did you follow him on I-40?

A.   Shortly after I-40 we were continuing eastbound, and I began to notify other officers in the area that there was, that the vehicle I was attempting to stop was not making any attempts to stop, and other vehicles began to get involved.  I attempted to get in front of the vehicle to possibly slow the vehicle down and allow someone else to make a traffic stop or provide that safely to be done, and the vehicle swerved towards my vehicle.  I backed up considerably at that point and made no further attempt to get in front of him.  We continued I-40. There is a split at Interstate 81.  We continued northbound on 81.  The vehicle passed the Exit 4 off ramp shortly, and went off into the grassy area, exited on Exit 4, turned right on Roy Messer Highway, continued to evade.  We come to the 113, Highway 113 intersection.  He turned right, which is southbound on 113, come to the inter, or Highway 25/70 cross, which he disregarded the stop sign, crossed over to the, over Highway 25/70, and my vehicle was an Explorer, and the acceleration speed is not that of a Crown Victoria.  So he was, at that point, created some distance between myself and him.  I'd lost him there for a while.  He, at that point, once he

crossed over 25/70 I didn't see him.  I had no
further contact with him.

Q.   Other officers were involved in the
pursuit...?

A.   They were.

Q.   ...at that point, correct?

A.   Correct.

THE COURT:  How fast did you get in all
this?

A.   I, I don't have - I didn't, I didn't
mark.  That may be on dispatch records because I
would have called in the speed over the, over the
radio, but I don't recall.  My vehicle has a limiter
of, and I believe it's 95 mile an hour.  I can't, I
couldn't be accurate for sure, but I do remember
hitting that limiter where the governor, the vehicle
governs back the speed at that point.

Q.   And you were not present when the
vehicle eventually came to a stop?

A.   I was not.

Q.   Did you ever go to that scene?

A.   I did.  Shortly after it stopped we
began to set up a perimeter because the location that
the vehicle wrecked in was that of a triangle area,
kinda, and it was surrounded by road on all sides,

and that area where he crashed, we just set up a
perimeter around that, that area.

          Q.   So when you got to the particular
location where the vehicle had come to a stop it
wasn't, what I would consider, a voluntary stop; it
was a crash?

          A.   It was a crash.  Yes, Ma'am.

          THE COURT:  Where did he crash?  What -
still on 113?

          A.   No, Sir.  I, and I would, I would have
to - I'm not sure.  I would have to, have to look at
the crash report, but he was on - there is - he was -
when you cross over Highway, off - from 113 when you
cross over Highway 25/70 that becomes Oak Grove Road,
I believe.  Oak Grove Road T's into Birchfield Road
and the location that he crashed would indicate that
he turned right on Birchfield Road which is a
triangle, excuse me, that will bring you back to
25/70, thereby taking a right and completing a
circle, he was on 25/70 headed eastbound, and the
vehicle was on the right side of the road.

          THE COURT:  He crashed on 25/70?

          A.   Yes, Sir.  At the intersection of
25/70 and Spring Creek Road.

          THE COURT:  And he crashed what, off to the

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1    right or...?

2              A.   Off to the, off to the right, but

3    there was a - where Spring Creek Road and Highway

4    25/70 are, he crosses over off of the roadway.

5              Q.   I have no further questions of this

6    witness, and I believe Mr. Leonard has something to

7    say to the Court.

8              MR. LEONARD:  Your Honor, Mr. Rogers, at

9    this point, wants me to withdraw the motion, and I'll

10   do so at his request.

11             THE COURT:  For whatever it's worth, I

12   concur fully.  Thank you, Sir.

13

14   THIS CONCLUDES THE TESTIMONY OF KEVIN POE AS

15   PRESENTED IN THIS MATTER.

16

17

18

19

20

21

22

23

24

25

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

1          THE COURT:  And that would seem to end our

2     business, does it not?

3          MS. HEBETS:  It does, Your Honor.

4          THE COURT:  Okay.  If nothing else, we

5     will...

6          CLERK:  All rise.  Court stands in

7     adjournment.

8

9     THIS COMPLETES ALL MATTERS AS PRESENTED IN THE

10    FOREGOING CASE.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2              I, Betty B. Neal, Notary Public and Court

3       Reporter, hereby certify that the foregoing is a true

4       and complete transcript of the PRETRIAL CONFERENCE

5       AND MOTION HEARING as heard in the aforementioned

6       case on the 7th of December, 2011.

7              WITNESS my hand and official seal at office

8       at Gray, Tennessee, this the 30th of January, 2012.

9

10

11

12

13                      NOTARY PUBLIC

14

15

16

17       My commission expires:  November 3, 2015

18       _____

19

20

21

22

23

24

25

**Barringer Court Reporting**
**P.O. Box 8035, Gray, TN - 423-477-7844**